EXHIBIT "A"

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.:   12 - 32 5 4 6 CA 06

DEMERX, INC.,

        Plaintiff,

vs.

CHRYSALIS PHARMA PARTNERS, LLC,

        Defendant.

_____/

THE ORIGINAL FILED

ON   AUG 16 2012

IN THE OFFICE OF
CIRCUIT COURT DADE C
CIVIL DIVISION

## COMPLAINT

Plaintiff, DemeRx, Inc., hereinafter ("DemeRx"), by and through its undersigned attorneys, sues Defendant, CHRYSALIS PHARMA PARTNERS, LLC, hereinafter ("Chrysalis"), and states:

### GENERAL FACTUAL ALLEGATIONS

1.    This is a cause of action where the amount in controversy is in excess of $15,000.00, exclusive of interest, costs, and attorneys' fees.

2.    Plaintiff is a corporation duly organized and in good standing in the State of Florida.

3.    Plaintiff's principal place of business is located at 4400 Biscayne Blvd., Suite 580, Miami, Florida 33137.

4.    Defendant Chrysalis Pharma Partners, LLC, Inc. is a limited liability company under the laws of the State of New Jersey, with offices at 385 Route 24, Suite 1G, Chester, NJ 07930, which entered into a contract with Plaintiff to provide certain services.

5.    This court has jurisdiction over this matter because all reports and Deliverables from Chrysalis were to be delivered to DemeRx at its offices in Miami-Dade County, Florida.

6.    On or about February 1, 2011, DemeRx and Chrysalis entered into a Drug Development Program Design and Management Consulting Agreement, a copy of which is attached hereto as Exhibit A (the "Original Contract").

7.    The purpose of the Original Contract was to procure for DemeRx an entity that had expertise in conducting the necessary studies and related tasks necessary to obtain regulatory approval to begin human testing of the patented chemical "Noribogaine" which, if ultimately approved by the appropriate regulatory authorities, would be used to treat drug-addicted subjects.

8.    A principal in Chrysalis, Dr. James McDonald, was well known by the then president of DemeRx, Dr. Rudolph Kwan, as the result of these two individuals working together in the development of new pharmaceutical drugs at an international pharmaceutical company.  Given the prior relationship, negotiations leading up to the Original Contract centered on what tasks were needed to fulfill the requirements for the filing of an application to begin human testing with the applicable governmental authorities.  The parties understood that DemeRx was relying solely upon the expertise of Dr. McDonald through his company, Chrysalis, as reflected in the opening paragraph of the Statement of Work included as Exhibit A to the Original Agreement.  That paragraph provides in part that: "Chrysalis ...will propose, implement, manage, and monitor the progress and regulatory compliance of the Preclinical Toxicology and

ADME (Absorption Distribution, Metabolism, Excretion) Program for the noribogaine Development Program)".

9.      As provided in the Original Contract, the actual testing and related activities would be conducted by third party contract research organizations (CRO's) and experts that would work for Chrysalis in monitoring the CRO efforts. However, in the end DemeRx was relying on Chrysalis to produce the finished product. This was spelled out in paragraphs numbered "3)" and "4)" of Exhibit A to the Original Contract, which provide as follows:

> 3)      CPP [Chrysalis] assumes responsibility for monitoring the conduct and reporting of these Studies and Reports such that the final Reports, and the data contained therein, will conform to FDA and ICH requirements.

> 4)      CPP will prepare the overall summary of the Studies detailing the results of the overall preclinical program (the "Summary") This Summary will meet the requirements of an FDA IND and ICH Common Technical Document and be suitable for health authority submission.

10.      DemeRx was also concerned about completing the studies in an expeditious manner in order to determine as early as possible the efficacy, if any, of noribogaine for treating drug addiction and to minimize the overhead costs of DemeRx. To this end, the parties to the Original Contract established as a goal the "Target Completion Date" of December 31, 2011 and provided for an incentive payment of up to $52,050 if the Deliverables were produced within that timeframe and certain other criteria were met (the "Incentive Fee").

11.    The limited financial resources of DemeRx were also of concern and, therefore, the Incentive Fee included the requirement that the fees not exceed the original estimate.

12.    The Original Contract was subsequently modified by Amendments #1 and #2, copies of which are attached hereto as Exhibits B and C.  Those amendments added and/or deleted various Research Studies to be conducted under the direction and control of Chrysalis and noted the changes in the estimated cost differentials.

13.    As the December 31, 2011, Target Completion date approached, Chrysalis representatives began to inject the need for additional compensation for work which would extend beyond the end of 2011, and the Target completion date. There was also a discussion about additional work beyond the original scope. Chrysalis then began to take the position that no work would be done after December 31, 2011, even on the original scope, unless Chrysalis was compensated for work done after that date. As negotiations continued and the end of 2011 neared, the demands for additional compensation intensified, as did the demand for an extension of the Target Completion Date by several months.

14.    Ultimately, the parties entered into a Third Amendment and Fourth Amendment to the Original Contract, as of December 29, 2011, copies of which are attached hereto as Exhibits D and E, respectively.  The Third Amendment was to cover only those Research Studies that were covered in the Original Contract, while the Fourth Amendment covered new studies that would be required for future human trials, which would include subjects suffering from addictions.

15.     The Third Amendment extended the Target Date to April 30, 2012; increased the quarterly management fee to Chrysalis from $40,000 to $65,000 for the last quarter of 2011; added an additional $140,000 to the management fee to continue the work through April 30, 2012; added another $86,000 projected for Vendor fees and reduced the number of studies to reflect only those actually undertaken. In addition, the Incentive Compensation Fee was increased from $52.050 to $75,000, and the contingencies to payment were modified to require the payment if the Deliverables, as defined in that Amendment, were timely submitted to DemeRx and met"... the generally accepted guidelines for global regulatory documents of this type and shall not be unreasonable withheld."

16.     As of the end of April 2012, Chrysalis had delivered to DemeRx a number of drafts of the various research studies, but as of that date only some of such reports were actually signed by the entity performing the studies, while another group of results were in draft form but not signed by anyone. In addition, as of that date not even a draft report had been received for the all-important NOL Dog toxicology study, used to determine the appropriate dosing levels for human study subjects. Ultimately, signed reports were received (albeit past the Target completion date) for all of the studies except for the stability test, which is still continuing. Given the lack of the stability test on specimens, all of the animal study reports include a qualification due to such missing information.

17.     On May 1, 2012, Chrysalis submitted an invoice to DemeRx demanding payment of the $75,000 incentive fee. After reviewing the facts and circumstances, DemeRx determined that the Deliverables provided by Chrysalis on or before April 30,

2012 did not meet the requisite acceptance criteria, and on May 10, 2012, DemeRx delivered a letter to Chrysalis setting forth the reasons, in part, as to why the payment requirements were not met.  A copy of that letter is attached hereto as Exhibit F.

## COUNT I – BREACH OF CONTRACT AND DAMAGES

18.     Plaintiff DemeRx reincorporates and re-alleges Paragraphs 1 – 17 of this Complaint.

19.     Defendant Chrysalis breached its contract with Plaintiff DemeRx by failing to deliver the required work in a timely fashion and to otherwise abide by the contract.

20.     As a result thereof, DemeRx has been damaged by an amount far in excess of $15,000, exclusive of costs, interest and attorney's fees.

**WHEREFORE**, Plaintiff demands damages against Defendant Chrysalis, along with costs of this action and reasonable attorney's fees, as well as such other relief as the Court deems just and proper.

## COUNT II – RESCISSION

21.     Plaintiff reincorporates and re-alleges Paragraphs 1-17 of this Complaint.

22.     Defendant refused to honor the Original Contract between the parties and threatened to abandon that Agreement, after having been paid most of the compensation due to it, unless Plaintiff re-negotiated the Agreement, providing substantial additional compensation, an increased incentive fee, and a new Target Completion Date.

23.     Had Defendant abandoned the Agreement at that point in late December 2011, without completing its tasks, Plaintiff would have been severely compromised

financially, and would have been unable to locate a new vendor to complete the studies in a timeframe acceptable to Plaintiff.

24.     As a result thereof, Plaintiff was forced to agree to the Third Amendment to the Original Contract.

25.     Under the circumstances herein, the actions of Defendant constituted duress to Plaintiff.

26.     Accordingly, the Third Amendment to the Original Contract should be rescinded, and all monies paid thereunder by Plaintiff to Defendant should be refunded to Plaintiff.

**WHEREFORE**, Plaintiff prays for rescission of the contract, specifically the Third Amendment to the Contract, together with damages as set forth herein, interest thereon from the dates of payment, costs of this action and reasonable attorney's fees, as well as such other relief as this Court deems just and proper.

Dated     8-16-12

Respectfully Submitted,

Greenspoon Marder, P.A.

Counsel for Plaintiff
100 W. Cypress Creek Road,
Suite 700
Fort Lauderdale, FL 33309
Telephone (954) 491-1120
Facsimile (954) 331-2037

By  _____
Joseph S. Geller
Florida Bar No. 292771



PLAINTIFF'S
EXHIBIT

A

## DRUG DEVELOPMENT PROGRAM DESIGN AND MANAGEMENT
## CONSULTING AGREEMENT

This DRUG DEVELOPMENT PROGRAM DESIGN AND MANAGEMENT CONSULTING AGREEMENT (this "Agreement"), is made and entered into as of this 1st day of February, 2011 (the "Effective Date"), by and between DemeRx, Inc., a corporation under the laws of the State of Florida USA with offices at 4400 Biscayne Boulevard, Suite 580, Miami, FL 33137 (the "Company"), and Chrysalis Pharma Partners, LLC, a limited liability Corporation under the laws of the State of New Jersey with offices at 385 Route 24, Suite 1G, Chester, NJ 07930 ("Advisor")

### INTRODUCTION

Whereas, the Company engages in the business of, among other things, drug discovery and development with the objective of developing new therapeutic entities in the area of drug addiction/pain management; and

Whereas the Advisor is in the business of providing services to entities engaged in developing new therapeutic drugs and the Company desires to retain the services of the Advisor as a consultant to the Company to assist the Company with respect to the design and management of the following specific drug development project: Noribogaine (the "Project"), all in accordance with the terms of this Agreement.

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENTS

1.   **Services.**

(a)   During the Term (as defined below), with respect to the Project the Advisor shall provide the services and deliverables in a timely fashion, all as set forth in the Statement of Work ("SOW") attached hereto as Exhibit A and incorporated herein by reference (respectively, the "Services" and "Deliverables") to or on behalf of the Company, devoting such time per month as Advisor shall deem reasonably necessary to carry out the goals of this Project.

(b)   Services hereunder shall be performed by Advisor over the telephone, in person at the Company's or the Advisor's offices or such other location or through written correspondence as determined by the Advisor and the Company (the "Parties"). Advisor agrees that Dr. James MacDonald will be the primary person performing the Services to be provided directly by the Advisor. If he is no longer the primary person, the Advisor will assign such other person possessing similar skills and experience and who is reasonably acceptable to the

Company.   Additional qualified personnel acting on behalf of the Advisor will also be used as described in (c) below. Contract Research Organizations (CRO's) are necessary for the Project. The CRO's will be selected as defined in (c) below and such contracts will be directly between the CRO and Company. In addition, the Project is scientifically based and the SOW entails new research. Therefore, it is possible that additional Services beyond the scope of the Services specified in the SOW, may need to be performed by the Advisor in connection with the Project, in which case the SOW and the Advisor's compensation would be modified, by mutual agreement, to describe such additional Services. In determining the compensation to be paid to the Advisor in such circumstances, the Parties agree that the individual compensation rates for the personnel performing such additional Services will be the same as that used in determining the compensation due to the Advisor as set forth in Table 2 to the SOW. However, if the SOW is not modified, but the Project is delayed (other than as a result of the Company's failure to timely perform its obligations) the Parties agree that the amount and timing of the compensation of the Advisor would remain the same as that currently set forth in Table 2 of the SOW.

(c)     As reflected in the SOW, the Advisor will engage two specific types of personnel to develop and manage the Project: 1) individuals referred to as program managers, consultants and individuals who will be responsible for CRO oversight (collectively, "Vendors") and 2) organizations with specific expertise in the necessary area to run studies necessary to support the drug development efforts ("CRO's").

(i)     The Vendors will be selected and contracted directly by the Advisor (after the Company has agreed to the use of each such entity for the Project). The only obligation of the Company with respect to such Vendors shall be the reimbursement to the Advisor of their fees in accordance with the provisions of Section 3(b) below.  The estimated reimbursable costs for these Vendors' services are included in the initial estimate of the overall Project costs, as set forth in Table 2 of the SOW (the "Estimated Project Costs").

(ii)     Unless otherwise agreed upon by the Company, the CRO's contracts shall be subject to the competitive bidding and selection process agreed upon by the Advisor and the Company and submitted to the Company's Board of Directors, a copy of which is attached, and conducted by the Advisor.  The Advisor has provided, as part of the Estimated Project Costs, estimates of the costs for each of the CRO potential contracts and agrees to use its best efforts to solicit bids for such Services at or below such estimates. The Advisor will submit the winning bidder's contract together with its reasons for the selection and any comments to the Company for its review, negotiation and approval.  The contracts with these organizations will be directly with the Company and the fees and expenses will be paid directly by the Company to the CRO's.

(d)     Unless otherwise agreed by the Parties, as it relates to the Project all Vendors and CRO's will work under the general supervision of, and report to, the Advisor.  It is

- 2 -

expected that the Advisor will serve as the single point of control for the Project and will consult frequently and closely with the Company with regard to the conduct of the Project.

(e)     The Parties each agree to assist and cooperate with the other party as may be reasonably requested and is in keeping with the spirit and intent of the Parties in achieving the goals of the Project as set forth herein; meeting the terms and conditions of this Agreement; and attempting to complete the Studies (as defined in the SOW) and provide the Reports (as defined in the SOW) within the desired timeframes specified herein.  In the event there are unexpected delays in meeting the timelines set forth in the SOW due to the breach of the Company's representations and warranties under Section 6 (b) below ("Company Delays"), the Parties agree that the start dates and completion dates set forth on Table 1 of the SOW, as well as the Target Completion Date (as defined in the SOW) impacted by such delays will be extended for the appropriate period by which each applicable target date has been actually impacted.

2.     **Term and Termination**.

(a)     This Agreement shall commence on the Effective Date and shall continue until the earlier of the termination of this Agreement, in writing, as provided below or the completion in full of the Services and Deliverables (the "Term").

(b)     The Company shall have the right to terminate this Agreement without cause at any time upon no less than thirty (30) days prior written notice to the Advisor.  In such an event, the Advisor shall be paid for all fees and expenses owed to it and its Vendors for services through the effective date of the termination.  The Company shall have no further payment obligations for compensation due the Advisor under this Agreement except as otherwise provided in Section 3(a) below regarding incentive payments.

(c)     Either party shall have the right to terminate this Agreement at any time upon written notice to the other party of a material breach by such other party and the failure of that other party to cure such breach within 30 days.  The written notice must specify the reason(s) for the notice and proposed termination and provide at least 30 days after receipt within which the other party can cure that breach. If the Company is the breaching party: (i), the Advisor shall be paid for all fees and expenses owed to it and its Vendors for services through the effective date of the termination; and (ii). The Company shall have no further payment obligations for compensation due the Advisor under this Agreement except as otherwise provided in Section 3(a) regarding incentive payments. If the Advisor is the breaching party: (i) the Company shall only be obligated to pay the Advisor for the incurred fees and expenses due it and its Vendors up to the date the breach occurred..

(d)     In the event of the early termination of this Agreement, the Parties agree to provide for an orderly transfer of the Advisor's duties to the Company or its designee under any and all Vendor contracts and the transfer and return to the Company of any materials, including Confidential Information, in its possession or control, except that the Advisor shall have the right to retain one copy for archival purposes only.

- 3 -

(e)     The provisions of Sections 3, 4, 5, 6, and 8 of this Agreement shall survive the expiration or termination of this Agreement.

3.     **Compensation**.

(a)     The Advisor's compensation shall consist of the twelve monthly cash payments forth in Table 2 of the SOW. No additional compensation will be due the Advisor (other than an incentive payment as described below, if applicable and any compensation for additional services as may have been agreed upon) if additional time after December 2011 is required to complete the Deliverables (unless additional overall efforts are required after the twelve months due solely to Company Delays). Advisor would be entitled to receive a full 15% incentive payment of [15% of $347,000 =] $52,050, in the event all of its Deliverables are completed: (i) on or before the Target Completion Date; (ii) within the original or modified overall budget set forth in Table 2 of the SOW; and (iii) the preclinical and toxicology portions of the IND (as defined in the SOW) as originally submitted to the regulatory authority are not a basis, in whole or in part, for the refusal by that authority to allow the human trials to begin. In the event that after the Advisor has satisfactorily completed the Deliverables on or before the Target Completion Date and within the original overall budget, the Company elects to terminate this Agreement in accordance with Section 2(b) above (termination for convenience) or to withdraw its IND, the Advisor shall receive an incentive fee of $26,025. If neither of the conditions entitling the Advisor to receive the full or incentive fee or half of the incentive fee are met, the Company in its sole discretion, may award an incentive payment of up to $52,050, with the exact amount of the incentive payment, if any, to be determined by the Company after taking into account any delays, cost increases or other problems attributable to; (i) the Company; (ii) third-parties not under the control or supervision of the Advisor; (iii) the Advisor, Vendors and CRO's; and (iv) additional testing that is required.

(b)     The compensation for the services of Vendors will be billed monthly to the Advisor and will be based upon the hourly rate basis agreed upon by the Vendor and the Advisor in the underlying contract; provided, however, that their fees, in the aggregate will be capped at the estimated aggregate amounts for Vendors set forth in Table 2 of the SOW and in no case will their fees exceed that estimated amount. The Advisor will submit the invoices from the Vendor to the Company for reimbursement and the Advisor agrees that it will not receive any markup with respect to such Services performed by the Vendors.

(c)     The Advisor agrees to review and approve, if appropriate, in writing, each such invoice as to the correct amount and appropriateness of the amounts billed. All payments to Vendors shall be subject to review and verification by the Company that such amounts are appropriate and consistent with the underlying agreements.

(d)     In addition to the fees pursuant to Table 2, the Company shall reimburse the Advisor for all customary and reasonable expenses incurred or paid by the Advisor or Vendors in connection with the performance of Services and provisioning of the Deliverables; provided that any such expenses are preapproved, in writing, by the Company, such approval will

- 4 -

not be unreasonably delayed or withheld. Neither the Advisor nor any of its Representatives (as defined below) shall be entitled to any benefits, coverages, or privileges, under any benefit or employee plan maintained by the Company.

(e)   The Company shall pay all undisputed invoices and other payments to the Advisor and Vendors within the later of 30 days of receipt of the invoice or 20 days following receipt of the approval by the Advisor as described above, if applicable. The Parties agree to work diligently together to resolve any disputed amounts due to the Advisor or any Vendors.

4.   **Confidentiality.**

(a)   Advisor acknowledges that in the course of performing the Service and providing the Deliverables to the Company, the Advisor or any of its employees, Vendors, or their officers, directors, employees, consultants and/or other agents (herein jointly and individually called "Representatives") will have access to and contact with confidential and proprietary information of the Company and its affiliates and will develop or learn of such information in the course of providing Services and Deliverables (collectively, "Proprietary Information"). Proprietary Information shall include, without limitation, (i) all data, reports, regulatory submissions (including drafts and sections thereof), analyses, notes, interpretations, formulations, processes, ideas, forecasts, records, documents, agreements, business plans, development plans and information concerning the Company, its business operations, products, processes, procedures, formulations development plans, product pipeline and intellectual property, whether or not patentable or copyrightable, which the Company may hereafter provide or previously has provided to the Advisor or its Representatives, or which the Advisor or its Representatives receives or receives knowledge of or access to, or develops or obtains from observation, examination, testing or analysis, at any time and in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems; (ii) all information which belongs to third parties but given to the Company under restrictions on use and disclosure; (iii) all notes, analyses, compilations, studies, interpretations or other documents and all copies thereof prepared by Advisor or its Representatives, which contain, reflect or are based upon, in whole or in part, any of the information which is described in the preceding clauses (i) and (ii); and (iv) the fact that Advisor is providing Services and Deliverables to the Company.

(b)   Advisor agrees and agrees to cause each of its Representatives to have in effect written agreements that it and they will not, during the Term or at any time thereafter, disclose to others (except as shall be required to perform the Services or provide the Deliverables), or use for its or their benefit or the benefit of others, any Proprietary Information or Inventions (as defined below). Upon request, the Advisor shall provide the Company with copies of the agreements with its Representatives as contemplated above and in Section 5 below.

(c)   In the event the Advisor needs to disclose any Proprietary Information to potential Vendors, it shall first require that such entities enter into confidential disclosure

- 5 -

agreements which impose upon such entities the same use and disclosure restrictions as that imposed upon the Advisor and its Representatives as set forth in this Section 4.

(d)     Proprietary Information shall not include any information which is (i) available to the public from a source other than the Advisor or any of its Representatives, (ii) released by the Company to the public or to persons who are not under a similar obligation of confidentiality to the Company and who are not parties to this Agreement, (iii) obtained by Advisor or any of its Representatives from a third party not under a similar obligation of confidentiality to the Company or independently generated without reference to any Company Proprietary Information, or (iv) required to be disclosed by any court process or any government or agency or department of any government; provided, the Advisor gives the Company prompt notice of the obligation and cooperates with the Company in any attempts to limit the disclosures of such information.

(e)     Upon termination of this Agreement or at any other time upon request by the Company, the Advisor shall promptly deliver to the Company all documents and materials embodying Proprietary Information in the possession or control of the Advisor or its Representatives; except that the Advisor shall have the right to retain one copy for archival purposes only.

(f)     Company shall contract directly with the CRO's with regard to a confidentiality agreement regarding Proprietary Information and Advisor shall not bear any liability or responsibility for ensuring the CRO's comply with their confidentiality agreement.

5.   **Inventions.**

All inventions, discoveries, data, technology, designs, innovations and improvements (whether or not patentable and whether or not copyrightable) arising out of or in connection with the Project which are made, conceived, written, designed or developed by the Advisor or its Representatives in performing the Services or providing the Deliverables hereunder, solely or jointly with others, and whether during normal business hours or otherwise ("Inventions"), shall be the sole property of the Company. Advisor hereby assigns and agrees to cause its Representatives to assign to the Company all Inventions and any and all related patents, copyrights, trademarks, trade names, and other industrial and intellectual property rights and applications therefor, in the United States and elsewhere, and Advisor hereby appoints and agrees to cause its Representatives to appoint any officer of the Company as its or their duly authorized attorney to execute, file, prosecute and protect the same before any government agency, court or authority. Advisor hereby waives all claims to moral rights in all Inventions and agrees to cause its Representatives to do the same. Upon the request of the Company and at the Company's expense, the Advisor shall execute and cause its Representatives to execute such further assignments, documents and other instruments as may be necessary or desirable to fully and completely assign all Inventions to the Company and to assist the Company in applying for, obtaining and enforcing patents or copyrights or other rights in the United States and in any foreign country with respect to any Invention.

6.    **Representations and Warranties**

    (a).    Advisor represents and warrants that:

        (i)    Its execution of this Agreement, the performance of the Services and the provisioning of the Deliverables will not cause any breach, default, or violation of any other employment, non-disclosure, confidentiality, non-competition, or other agreement to which the Advisor or any of its Vendors may be a party or otherwise bound;

        (ii)    Except as described in any agreements between the Advisor and the Vendors as contemplated herein, there are not now, nor will there be during the Term of this Agreement any ownership relationships or agreements, written or oral, between the Advisor or any Vendor which could result in any such entity receiving a financial benefit from the entering into of this Agreement. However, the Company acknowledges that the Advisor and Vendors may work on other projects for other companies and receive compensation for such work.

        (iii)    All Services will be performed in a professional and workmanlike manner; and in full compliance with all applicable laws and regulations;

        (iv)    All Deliverables will conform to the specifications contained in the SOW and will be delivered in a timely manner, time being of the essence with respect to all time dated milestones;

        (v)    It has or will obtain written agreements in a form reasonably acceptable to the Company from all Vendors who participate in the Project which impose confidentiality and use obligations on personnel providing Services for such Vendors to the same degree as imposed upon the Advisor as set forth in Section 4 above and effectively vest in the Advisor any rights which such personnel might otherwise have in the results of their work and are adequate to permit the Advisor to assign any such rights, to the extent covering the Company's intellectual property rights as set forth in Section 5 above; and

        (vi)    It has never been and no person, corporation, partnership, association or other entity employed or engaged by the Advisor to perform any Services or provide any Deliverables has ever been (A) debarred or threatened to be debarred; (B) disqualified from participating in studies related to submissions to one or more regulatory authorities; (C) accused or found guilty of scientific misconduct by any government agency; or (D) indicted for a crime or otherwise engaged in conduct for which a person can be debarred under 21 U.S.C. 335a (as amended). In the event that the Advisor or any other person associated with performing any of the Services or providing any of the Deliverables becomes: (X) debarred; or (Y) aware of or receives notice of the debarment of any Representatives, the Advisor agrees to immediately notify the Company of such facts.

-7-

(b).    Company represents and warrants that:

(a)  It is responsible for the timely delivery of Noribogaine API of sufficient quality and quantity necessary to carry out the SOW based upon a mutually agreed upon delivery schedule and API specifications,

(b)  It will provide Advisor with timely access to Company's personnel and information; and

(c)  It will not unreasonably delay or withhold approval of contracts, invoices, or payments.

7.     **Limitations Upon Liability, Indemnities and Insurance**

EXCEPT WITH RESPECT TO: (I) THE BREACH OF PROPRIETARY INFORMATION, INVENTION, AND OWNERSHIP UNDER SECTIONS 4 AND 5 ABOVE; AND (II) DAMAGES RESULTING FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD BY ADVISOR RELATING TO SUCH SERVICES, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY WHETHER A CLAIM BE IN TORT, CONTRACT OR OTHERWISE: (1) FOR ANY AMOUNT IN EXCESS OF THE TOTAL PROFESSIONAL FEES TO BE PAID BY THE COMPANY TO ADVISOR UNDER THIS CONSULTING AGREEMENT; OR (2) FOR ANY LOST PROFITS OR CONSEQUENTIAL, INDIRECT OR SIMILAR DAMAGES RELATED TO THE SERVICES OR DELIVERABLES TO BE PROVIDED UNDER THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY

In the event it is determined that Advisor or its Vendors have failed to perform any of the Services or provide any of the Deliverables in accordance with the terms of the applicable Contract, then Advisor's liability to the Company with respect to such matters will be limited to an amount equal to the amount of the fees paid to Advisor.

**Indemnities**

a.  The Company agrees to indemnify and hold harmless the Advisor from and against any liability, loss, damage, action, claim or expense (including reasonable attorney's fees) (collectively, "Losses") arising from any third party claim relating to (a) the performance of the Services materially in accordance with the SOW and this Agreement, or, (b) the Company's negligence or willful misconduct, in each case save for any Losses for which the Advisor is obligated to indemnify the Company hereunder.

The Advisor agrees to indemnify and hold harmless the Company from and against any Losses, subject to the language herein, arising from any third party claim relating to (a) a failure by the Advisor to perform the Services materially in accordance with the SOW or this Agreement, or applicable law or regulations, or, (b) the Advisor's willful misconduct, in each case save for any Losses for which the Company is obligated to indemnify the Advisor hereunder.

Insurance

The Advisor agrees during the Term and for two years thereafter to carry and maintain, at its own expense, insurance coverage of the kind and with liability limits appropriate to the circumstances to protect itself.

8      Independent Contractor Status.

(a)     Advisor shall perform all services under this Agreement as an "independent contractor" and not as an employee of the Company.

(b)     Advisor is responsible for all taxes (federal, state and local) due with respect to the compensation paid or payable pursuant to this Agreement and shall indemnify and hold the Company and its officers and directors harmless from and against all such liabilities.

(c)     Except as otherwise specifically provided in this Agreement, the Advisor is not authorized to create any liability, obligation or responsibility, express or implied, on behalf of, or in the name of, the Company or to bind the Company in any manner without the prior written consent of the Company as to each specific document.

9.      Miscellaneous.

(a)     Except as described in Paragraph 1 of this Agreement, the Advisor may not assign, transfer or delegate its obligations under this Agreement without the express prior written consent of the Company, which will not be unreasonably withheld. The Company may freely assign this Agreement in its entirety to a successor to substantially all of the business to which this Agreement relates. All of the terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, the Company's successors and assigns, including any corporation with which, or into which, the Company merges or which succeeds to its assets or business.

(b)     All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to the Advisor:

    Chrysalis Pharma Partners, LLC
    Attn: Bruce C. Galton
        Managing Director
        385 Route 24, Suite 1G
        Chester, NJ  07930

    bgalton@chrysalispharma.com
    FAX:  908-926-2575

    With a copy to

    David A. Stern, Esq.
    60 Washington Street
    Morristown, NJ 07960
    Dstern24@optonline.net

If to the Company:
    DemeRx, Inc
    Attn: Dr. Rudolf Kwan, President
    4400 Biscayne Blvd.
    Suite 580
    Miami, FL 33137

    Facsimile: 305-405-1701
    e-mail: rkwan@demerx.us

    With a copy to
    Dr. Stefan Schwabe
    4400 Biscayne Blvd.
    Suite 580
    Miami, FL 33137
    Facsimile: 305-405-1701
    e-mail: sschwabe@demerx.us

    Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed (fax or email delivery shall be deemed receipt if promptly followed by another form of delivery provided for hereunder); (ii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight

- 10 -

delivery service; or (iii) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance therewith, may specify a different address for the giving of any notice hereunder.

(c)     This Agreement: (i) may be executed in any number of counterparts (including facsimile signatures), each of which, when executed by both parties to this Agreement shall be deemed to be an original, and all of which counterparts together shall constitute one and the same instrument; (ii) shall be governed by and construed under the laws of the State of Florida applicable to contracts made, accepted, and performed wholly within such state, without application of principles of conflicts of law; (iii) together with any attachments constitute the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts, and the like between the parties in such respect, except with respect to that certain Consulting Agreement between the Parties dated November 1, 2010, which is being modified this even date to reflect the incorporation into this Agreement of the monthly fee originally provided under that Agreement and related changes; (iv) may be amended, modified or waived in whole or in part only by a writing executed by both Parties; (v) contains headings only for convenience, which headings do not form a part, and shall not be used in construction, of this Agreement; and (vi) is not intended to inure to the benefit of any third-party beneficiaries.

(d)     Advisor acknowledges and agrees that the agreements and restrictions contained in Sections 4, and 5 are necessary for the protection of the business and goodwill of the Company and are reasonable for such purpose. Advisor acknowledges and agrees that any breach of the provisions of Sections 4 and 5 may cause the Company substantial and irreparable damage for which the Company cannot be adequately compensated by monetary damages alone, and, therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief without the necessity of proving actual damages.

(e)     No failure on the part of either Party to exercise and no delay in exercising any right hereunder shall operate as a waiver of such right, nor shall any single or partial exercise of such right preclude any other further exercise or exercise of any other right.

(f)     Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other then-existing or subsequent breach.

(g)     In case one or more of the provisions of this Agreement is determined to be invalid, illegal, or unenforceable in any respect, such provision shall be reformed to the minimum extent necessary to cause such provision to be valid, legal, or enforceable. If no such

reformation is possible, then such provision shall be deemed omitted and the balance of the Agreement shall remain valid and enforceable.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year set forth above.

DEMERX, INC.

By: _____
Name: Dr. Rudolf Kwan,
Title: President

CHRYSALIS PHARMA PARNTERS, LLC

By: _____
Name: James S. MacDonald, Ph.D.
Title: President

## Exhibit A

## STATEMENT OF WORK

Chrysalis Pharma Partners, LLC (CPP) will propose, implement, manage, and monitor the progress and regulatory compliance of the Preclinical Toxicology and ADME (Absorption, Distribution, Metabolism, Excretion) Program for the noribogaine Development Program. This program will result in, as a final delivery by CPP, English language reports that meet FDA and ICH Common Technical Document requirements for inclusion in the IND application and/or equivalent outside the USA (the "Reports"). The specific studies that form the basis of the proposal are listed below. The initiation dates are suggested based on what might be possible but are completely dependent on availability of suitable API, ability to place contracts at acceptable Contract Research Organization(s) (CRO's), and availability of capacity at these desired CRO's. The anticipated time for delivery of the Reports from these studies is given in the table below. These projected timelines are dependent on the findings in the respective studies and the possible need to perform follow-up activities within the studies that will delay the availability of the Reports. The overall objective is to have the Reports available from these preclinical activities by 12/31/2011 (the "Target Completion Date") that support filing of an IND.

## SERVICES

To accomplish the tasks necessary to achieve the overall objective of drug development, the Company is transferring some of its obligations as Sponsor for the preclinical toxicology and ADME studies and reports to CPP, including those studies conducted by CRO(s) contracted by the Company to perform the actual studies.

Services required to be performed under this Contract shall include but not be limited to CPP undertaking the following tasks on behalf of the Company:

1)     CPP will design the preclinical program to support the initiation of human clinical studies for the development of noribogaine globally. This preclinical program will meet scientific and regulatory requirements including:

    a. An overall plan for preclinical studies to be conducted to support the initiation of human clinical studies as required by ICH and FDA(the "Studies").

    b. Developing specific preclinical protocols required to perform the Studies once the overall plan has been accepted.

2)     For each study, CPP will, identify and solicit qualified CRO(s) to perform the Study, evaluate the responses, submit the winning bidder's contract together with its reasons for the selection and any comments to the Company for its review, negotiation and approval. The Advisor will also work with the Company in modifying any of the terms of the proposed contract which address the technical aspects of the Study being contracted for with the CRO. The ultimate contract will be between the Company and the CRO but CPP will be the designated entity to act on behalf of the Company in monitoring and supervising the performance of the applicable Studies and the resulting Reports to ensure compliance with GLP regulations (21 CRF

Part 58), when required, and/or other applicable FDA and ICH requirements such that the results may be relied upon to support regulatory decisions regarding noribogaine. CPP will, in performing such obligations make every effort to assure that the chosen CRO's are operating under GLP regulations in every respect and will use experts in preclinical studies to monitor and assess the selection, placement, and operation of the chosen Studies. It is understood, however, that no formal quality or compliance audit of the chosen CRO will be undertaken by CPP and the ultimate responsibility for full compliance with GLP regulations rests with the testing facility.

3)      CPP assumes responsibility for monitoring the conduct and reporting of these Studies and Reports such that the final Reports, and the data contained therein, will conform to FDA and ICH requirements.

4)      CPP will prepare the overall summary of the Studies detailing the results of the overall preclinical program (the "Summary") This Summary will meet the requirements of an FDA IND and ICH Common Technical Document and be suitable for health authority submission.

## DELIVERABLES

The Studies and associated Reports that will be required to support initiation of first-in-human studies with noribogaine are listed below. This Study list and target deliverable dates for the associated Reports are based on an optimum study performance and outcome. CPP will manage the process of preparation of Final Reports in such a way that the overall objective of completion of the Program by 12/31/11 is not compromised. It is understood that the individual Target Report Dates listed in Table 1, may vary as part of this overall management process. The findings from these Studies may require evaluation of additional endpoints or the performance of additional studies to enable initiation of initial human studies. These additional efforts will be beyond the scope of this contract and will require additional effort on the part of CPP.

## TABLE OF STUDIES AND REPORTS DELIVERABLE BY CPP NECESSARY TO SUPPORT INITIATION OF CLINICAL TRIALS WITH NORIBOGAINE

Table 1

| STUDY | ESTIMATED START DATE[1] | DURATION[2] | TARGET FINAL REPORT TIMING[3] | |
|---|---|---|---|---|
| Metabolic Stability -mouse, rat, dog, | April 01 | One month | Two months | |

| human | | | | |
|---|---|---|---|---|
| CYP inhibition | April 01 | One month | Two months | |
| CYP induction | April 01 | One month | Two months | |
| Single dose PK – rat | April 01 | One month | Three months | |
| Single dose PK – dog | April 01 | One month | Three months | |
| Bioanalytical method development and validation (rat, dog, human plasma) | February 01 | 3 months | 6 months | |
| Ames test | April 01 | One month | 3 months | |
| In vitro micronucleus assay | April 01 | One month | 3 months | |
| hERG assay – GLP | April 01 | One month | 3 months | |
| CV safety pharmacology – dog | May 01 | 2 months | 5 months | |
| CNS safety pharmacology – rat | May 01 | One month | 4 months | |
| Respiratory safety pharmacology – rat | May 01 | One month | 4 months | |
| 14 day eDS – rat | May 01 | 2 months | 4 months | |
| Single dose – dog | May 01 | 1 month | 3 months | |
| 14 day eDS – dog | May 15 | 2 months | 4 months | |
| 28 day GLP tox – rat | July 1 | 4 months | 5 months | |
| 28 day GLP tox – dog | July 15 | 4 months | 5 months | |
| Summary of preclinical tox/ADME studies suitable for incorporation into IND | Aug 1 | 3 months | 3 months | |

[1] assumption is that GLP-quality API will be available at the CRO study site as agreed upon by the parties.
[2] duration to the availability of data to enable decision making on next steps; availability of final reports estimated in column 4
[3] duration to the availability of final Reports suitable for incorporation into IND. This Deliverable includes the preparation and delivery by CPP of the Summary. Does not include CMC portion of IND; a separate work stream will need to be constructed for this effort; this effort is not a part of this contract and is the responsibility of the Company.

OTHER REPORTING REQUIREMENTS

CPP will participate in the Company's weekly management meetings as appropriate, and will update the Company at least monthly on the progress of the Studies, including any issues identified and their suggested resolution. CPP will deliver to the Company any appropriate documents or data as part of this ongoing updating process. CPP will immediately inform the Company of significant deviations from the protocols or regulatory requirements or other issues requiring urgent attention that may impact the overall budget or time table.

**Table 2**

### ESTIMATED PROJECT COSTS 2011
#### (U.S. $ 000)

|  |  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vendors capped at | $135K |  | 7 | 10 | 14 | 15 | 12 | 18 | 15 | 8 | 21 | 10 | 5 |
| 135   Advisor Fixed at | $212K | 13 | 24 | 23 | 23 | 24 | 13 | 15 | 14 | 13 | 13 | 14 | 23 |
| 212 |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Subtotal for Vendors and Advisor 347 |  | 13 | 31 | 33 | 37 | 39 | 25 | 33 | 29 | 21 | 34 | 24 | 28 |

CRO's budgeted at $1.726K and billed directly to the Company

Total Project Costs budgeted at $2,073,000.

## PROJECT COORDINATORS.

Company Project Manager: Dr. Stefan Schwabe

Advisor Project Manager: Dr. James MacDonald





## AMENDMENT #1 TO THE CHRYSALIS CONSULTING AGREEMENT

This letter amends Table 1 of the **Drug Development Program Design and Management Consulting Agreement** dated February 1, 2011 between DemeRx, Inc. and Chrysalis Pharma Partners, LLC. The parties agree the following research study needs to be added to the **TABLE OF STUDIES AND REPORTS** Table 1 of the Agreement, to support the Noribogaine project:

| RESEARCH STUDY | ESTIMATED START DATE | DURATION | ESTIMATED COST |
|---|---|---|---|
| Development of | | | |
| Photostability Assay | March 2011* | less than 30 days | $4,000-$5,000 |

*Dependent upon delivery of material

Amendment agreed to this 2ND day of March, 2011:

By: _____

Stefan Schwabe, MD

**Chief Operating Officer**

DemeRx, Inc.

_____

Bruce Galton

**Managing Director**

**Chrysalis Pharma Partners, LLC**



**Chrysalis**

### AMENDMENT #2 TO THE CHRYSALIS CONSULTING AGREEMENT

This letter amends Table 1 of the **Drug Development Program Design and Management Consulting Agreement** dated February 1, 2011 between DemeRx, Inc. and Chrysalis Pharma Partners, LLC. The parties agree the following research studies need to be amended in the **TABLE OF STUDIES AND REPORTS** Table 1 of the Agreement, to support the Noribogaine project:

| RESEARCH STUDY | ESTIMATED START DATE | DURATION | ESTIMATED COST |
|---|---|---|---|
| **ADD:** In-vitro Mammalian Chromosome Aberration Test (HPBL) | on or before May 15, 2011* | approx. 10 weeks | $38,800** |

*Dependent upon delivery of material estimated at 2.5g

**direct CRO costs only, excludes additional Chrysalis and Project Manager fees to be subject of separate Work Order

| | | | |
|---|---|---|---|
| **DELETE:** In-vitro micronucleus assay* | May 11, 2011 | 20 days | $ 20,000 |

*required 2.4 g of material

Amendment agreed to this 11th day of April, 2011:

By: _____

Stefan Schwabe, MD

Chief Operating Officer

DemeRx, Inc.

_____

Bruce Galton

Managing Director

Chrysalis Pharma Partners, LLC



PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL

## THIRD AMENDMENT TO THE

## DRUG DEVELOPMENT PROGRAM DESIGN AND MANAGEMENT CONSULTING AGREEMENT

## BETWEEN DEMERX, INC. AND CHRYSALIS PHARMA PARTNERS, LLC

## DATED FEBRUARY 1, 2011 (the "Agreement")

This Third Amendment to the Agreement effective as of the 29th day of December, 2011 (the "Effective Date"), is made by and between DemeRx, Inc. ("DemeRx") on the one hand, and Chrysalis Pharma Partners, LLC ("Contractor") on the other hand.

### RECITALS

As contemplated under the Agreement, modifications to the Agreement may be needed to reflect results of various tests and other unexpected conditions and delays encountered during the course of the work performed under the Agreement.

The parties have now reviewed the remaining Toxicology, Drug Metabolism and Pharmacokinetic ("TOX/DM/PK") work that is believed to be required in order to submit the necessary TOX/DM/PK documentation to the governing regulatory authorities for their approval to permit the first in humans testing of Noribogaine and the parties desire to modify the Agreement to reflect such work, the approximate timetables for completion of the remaining work, and the compensation to be paid to Advisor and Vendor.

### AGREEMENTS

Now therefore, based upon the above premises and other good and valuable consideration, the parties to the Agreement agree as follows:

1. Capitalized terms as used herein but not defined herein shall have the meaning set forth in the Agreement

2. The Statement of Work to the Agreement is hereby modified and amended as set forth in Table 1A attached hereto in order to provide: (i) an update of all of the executed study contracts and or work orders; an extension for the remaining and revised work required for the TOX/DM/PK studies in connection with the submittal of the IND for the first in humans trials (the "First In Humans IND"); and (ii) for the additional compensation and expenses for Contractor and its Vendors associated with their remaining work for the Statement of Work, as modified and amended, for the First in Humans IND. Table 1A reflects the actual and anticipated studies for which the work, deliverables and summary reports described in the Statement of Work are to be provided by the Advisor and its Vendors. Table 2A attached hereto sets forth the

monthly payments during the period October 2011 through April 30, 2012 to the Advisor and its Vendors for their work under the Statement of Work, as modified and amended, for the First in Humans IND.

3.  The Target Completion Date as set forth in the introductory paragraph of the Statement of Work is hereby extended from December 31, 2011 to April 30, 2012.

4.  Section 3(a) of the Agreement is hereby modified to provide that the full incentive compensation fee of $52,050 is increased to $75,000 and the other lesser fees of $26,025 contained in that Section are increased to $40,000. The full incentive payment of $75,000 will be paid to the Advisor in its entirety upon acceptance (within ten (10) business days) of the Tox/DM/PK  IND package if delivered to DemeRx on or before April 30, 2012. DemeRx' acceptance of the Tox/DM/PK IND package shall be based on generally accepted guidelines for global regulatory documents of this type and shall not be unreasonably withheld.  The lesser fee of $40,000 will be paid to the Advisor in its entirety if DemeRx terminates the Agreement for any reason other than material breach by the Advisor.

5.  Except as modified above, the Agreement and Statement of Work as previously modified, amended and/or restated remains in full force and effect and, where applicable, apply to the matters set forth in this Amendment. Due to the nature of scientific research, the Parties acknowledge that study results may require that the studies be amended to include additional testing, data analysis and evaluation and therefore may require modifications to cost and completion dates that cannot be forecast prospectively but, may be agreed by both Parties, to Tables 1A and 2A.

In Witnesseth Whereas, each of the parties has caused this Amendment to be executed and delivered by its duly authorized representative as of the date first above written.

**Chrysalis Pharma Partners, LLC**          **DemeRx, Inc.**

By: _____          By: _____
Name: JAMES S. MACDONALD          Name: RUDOLF KWAN
Title: PRESIDENT          Title: PRESIDENT

Attachments:

Table 1A
Table 2A

**Table 1A**

| Task Name | Duration | Start | Finish | Status |
|---|---|---|---|---|
| Project Planning | 21 days | Fri 2/4/11 | Fri 3/4/11 | NORIBOGAINE as of November 15, 2011 |
| Identify & Engage Resource for Bioanalytical Assay Development | 35 days | Mon 2/28/11 | Fri 4/15/11 | |
| Execute Contract: Client and Resource | 0 days | Tue 3/8/11 | Tue 3/8/11 | |
| Identify CRO Resources, Discuss Project and Solicit Quotes for Services for Client Review | 30 days | Fri 2/18/11 | Thu 3/31/11 | |
| Identify & Engage Resource for Photosensitivity Assay | 23 days | Fri 2/4/11 | Tue 3/8/11 | |
| Receive 500mg Material for Assay Development | 0 days | Tue 3/22/11 | Tue 3/22/11 | |
| Develop Photosensitivity Assay | 7 days | Wed 3/23/11 | Thu 3/31/11 | |
| Submit Quotes to Client | 0 days | Wed 4/6/11 | Wed 4/6/11 | |
| Receive Client Decision on Quotes | 0 days | Thu 4/14/11 | Thu 4/14/11 | |
| Engage CRO Resources or Identify New Resources | 9 days | Fri 4/15/11 | Wed 4/27/11 | |
| Initiate Bioanalytical Assay Development: rat, dog, human plasma | 67 days | Thu 6/30/11 | Fri 9/30/11 | Delete Human Plasma Assay Development at Agilux |
| Initiate Metabolic Stability: mouse, rat, dog, human | 18 days | Tue 5/31/11 | Thu 6/23/11 | Final Report Received Aug.22 |
| Initiate CYP Inhibition (microsomes) | 40 days | Tue 5/31/11 | Mon 7/25/11 | Final Report Received Oct.5 |
| Add'l CYP Inhibition (hepatocytes) | 11 days | Mon 7/18/11 | Mon 8/1/11 | Final Report Received Oct.5 |
| Receive GLP Material | 0 days | Mon 7/18/11 | Mon 7/18/11 | SAFC Lot 2049 |
| Initiate Single Dose PK: Rat | 24 days | Fri 7/29/11 | Wed 8/31/11 | Draft Report Received Aug. 31 |
| Initiate Single Dose PK: Dog | 23 days | Tue 8/9/11 | Thu 9/8/11 | Draft Report Received Sept. 8 |

| Task Name | Duration | Start | Finish | Status |
|---|---|---|---|---|
| Add'l Single Dose PK Dog | 21 days | Tue 9/6/11 | Tue 10/4/11 | Draft Report Received Oct. 4 |
| CV Safety Pharmacology-dog | 48 days | Mon 9/26/11 | Wed 11/30/11 | Dosing Sept. 28 Draft Report due Nov. 30 |
| CNS Safety Pharmacology-rat | 35 days | Mon 8/1/11 | Fri 9/16/11 | Draft Report Received Sept. 16 |
| Respiratory Safety Pharmacology- rat | 27 days | Wed 8/10/11 | Thu 9/15/11 | Draft Report Received Sept. 15 |
| Single Dose Study-dog | 36 days | Thu 8/4/11 | Thu 9/22/11 | Draft Report Received Sept. 22 |
| Single Dose Study-rat | 34 days | Mon 7/25/11 | Thu 9/8/11 | Draft Report Received Sept. 8 |
| Pathologist at ITR | 28 days | Fri 7/29/11 | Tue 9/6/11 | |
| Rat Brain Assay | 35 days | Mon 9/5/11 | Fri 10/21/11 | all samples have been assayed at Agilux |
| Protein Binding Study | 71 days | Thu 9/15/11 | Thu 12/22/11 | study completed |
| hERG Study-GLP | 20 days | Mon 10/24/11 | Fri 11/18/11 | study completed |
| Develop hERG Assay | 16 days | Mon 10/24/11 | Mon 11/14/11 | study completed |
| 14 day tox rat GLP | 80 days | Mon 10/3/11 | Thu 1/19/12 | draft report estim.1/19 Dosing Oct.17 |
| 14 day tox dog GLP | 82 days | Fri 11/4/11 | Fri 2/24/12 | draft report estim.2/24 Dosing Nov. 14 |
| Initiate Ames test | 36 days | Tue 11/29/11 | Mon 1/16/12 | Estimated receipt of draft rept Jan.6 |
| In-vitro Mammalian Chrom. Aberration Test (HPBL) | 56 days | Thu 12/8/11 | Wed 2/22/12 | Estimated receipt of draft rept Feb. 17 |
| Preparation of Tox/DM/PK Portion of IND | 128 days | Mon 10/17/11 | Tue 4/10/12 | |
| Summarize all preclinical data | 118 days | Mon 10/17/11 | Tue 3/27/12 | |
| Deliver Preclinical Sections of IND | 0 days | Tue 4/10/12 | Tue 4/10/12 | |

## Table 2A

### PROJECT MANAGEMENT COSTS (U.S. DOLLARS)

Vendor fees represent a Cap of $66,000 for the Quarter ended December 31, 2011 and $86,000 for the four months ended April 30, 2012 and may vary month to month within the Quarter/period.  Advisor fees are Fixed Fees and will be paid by the 15th of the month in arrears. The IND TOX package preparation cost is capped at $35,000, but may vary in amount by month.

The DemeRx shall reimburse Project Manager for direct fees and expenses of the Vendors and the IND TOX work as evidenced by invoices presented to DemeRx, not to exceed in the aggregate the respective CAP amounts without DemeRx approval as stated below.

| Month | 11-Oct | 11-Nov | 11-Dec | 12-Jan | 12-Feb | 12-Mar | 12-April |
|-------|--------|--------|--------|--------|--------|--------|----------|
| Vendors* | 22 | 22 | 22 | 21.5 | 21.5 | 21.5 | 21.5 |
| Advisor | 20 | 20 | 25 | 35 | 35 | 35 | 35 |
| IND TOX |  | 2 | 3 | 7.5 | 7.5 | 7.5 | 7.5 |
| Total | 42 | 44 | 50 | 64 | 64 | 64 | 64 |

*Vendor fees for the period January through April 2012 are estimates and should the cap need to be increased in order to carry out the purposes of the Program or a project, Rudy Kwan at DemeRx has the authority to immediately approve such increase or to agree that the Vendors should not carry out that part of the Program or project to which the cap adjustment would pertain.

**Sandy Morgan**

| | |
|---|---|
| From: | Sandy Morgan |
| Sent: | Thursday, August 16, 2012 1:55 PM |
| To: | Accounting Requests |
| Subject: | FW: Scanned from MFP-04434919 08/16/2012 10:29 |
| Attachments: | DOC081612.pdf |

Please allocate and finalize The attached. We are done and closing our file.

Sandy Morgan, PLS
100 W. Cypress Creek Road
Fort Lauderdale, FL 33309
Phone: (954) 491-1120 ext 2993
Fax:  (954) 771-9264
sandy.morgan@gmlaw.com


-----Original Message-----
From: Tos-720-6mail [mailto:DoNotReply@greenspoonmarder.com]
Sent: Thursday, August 16, 2012 11:29 AM
To: Sandy Morgan
Subject: Scanned from MFP-04434919 08/16/2012 10:29

Scanned from MFP-04434919.
Date: 08/16/2012 10:29
Pages:3
Resolution:200x200 DPI
--------------------------------------
Do not reply!



PLAINTIFF'S
EXHIBIT
C

# FOURTH AMENDMENT TO THE
## DRUG DEVELOPMENT PROGRAM DESIGN AND MANAGEMENT CONSULTING AGREEMENT
## BETWEEN DEMERX, INC. AND CHRYSALIS PHARMA PARTNERS, LLC
### DATED FEBRUARY 1, 2011 (the "Agreement")

This Fourth Amendment to the Agreement effective as of the 29th day of December, 2011 (the "Effective Date"), is made by and between DemeRx, Inc. ("DemeRx") on the one hand, and Chrysalis Pharma Partners, LLC ("Contractor") on the other hand.

## RECITALS

As contemplated under the Agreement, modifications to the Agreement may be needed to reflect results of various tests and other unexpected conditions and delays encountered during the course of the work performed under the Agreement.

The parties desire to expand the original studies to include monkey and additional dog studies as well as CYP Induction studies.

## AGREEMENTS

Now Therefore, based upon the above premises and other good and valuable consideration, the parties to the Agreement agree as follows:

1. Capitalized terms as used herein but not defined herein shall have the meaning set forth in the Agreement

2. A new Table 1B is hereby added to the Statement of Work contained in the Agreement, a copy of which is attached hereto. This modification to Table 1, as previously amended, adds the additional studies described in Table 1B and associated summary reports to the Services to be provided under the Agreement.

3. A new Table 2B is hereby added to the Statement of Work to reflect the fee payment schedule for the Services described in the Statement of Work attributable to the additional work identified in Table 1B.

4. Since these additional studies are not part of the information needed as a part of the IND application for the first in human trials, neither the Target Completion Date as set forth in the introductory paragraph of the Statement of Work nor the incentive compensation provisions set forth in Section 3(a) of the original Agreement are modified as a result of these additional studies.

5. Except as modified above, the Agreement and Statement of Work as previously modified, amended and/or restated remains in full force and effect and, where applicable, apply to the matters set forth in this Amendment.

In Witnesseth Whereas, each of the parties has caused this Amendment to be executed and delivered by its duly authorized representative as of the date first above written.

**Chrysalis Pharma Partners, LLC**            **DemeRx, Inc.**

By: _____            By: _____
Name: JAMES S. MACDONALD        Name: RUDOLF KWAN
Title: PRESIDENT                               Title: PRESIDENT

Attachments:

Table 1B
Table 2B

## Table 1B

| Non-GLP Monkey MTD | 57 days | Mon 11/7/11 | Mon 1/23/12 | draft report 1/23/12 Dosing starts Dec. 7 |
|---|---|---|---|---|
| Assay Monkey Plasma Samples | 28 days | Thu 12/15/11 | Fri 1/20/12 | sample analysis |
| Initiate CYP Induction | 35 days | Wed 1/25/12 | Tue 3/13/12 | Yet to be Scheduled at XenoTech Placeholder |
| Convulsion Study-dog | 15 days | Wed 1/5/11 | Tue 1/25/11 | Yet to be Scheduled at ITR Placeholder |

## TABLE 2B: (U.S. $000)
## PROJECT MANAGEMENT FEES

| Month | 11-Oct | 11-Nov | 11-Dec | 12-Jan | 12-Feb | 12-Mar | 12-April |
|---|---|---|---|---|---|---|---|
| Vendors* | - | 2 | 4 | 5 | 5 | 5 | 5 |
| | | | | | | | |
| | | | | | | | |
| Total | - | 2 | 4 | 5 | 5 | 5 | 5 |

The Company shall reimburse project manager for direct fees and expenses of the vendors as evidenced by invoices presented to the Company, not to exceed in the aggregate the cap of $26,000.

* Vendor fees for the period January through April 2012 are estimates and should the cap need to be increased in order to carry out the purposes of the Program or a project, Rudy Kwan at DemeRx has the authority to immediately approve such increase or to agree that the Vendors should not carry out that part of the Program or project to which the cap adjustment would pertain.

DemeRx Work Order                    CONFIDENTIAL                    Page 4 of 4





**DemeRx**

4400 Biscayne Blvd., Suite 580, Miami, FL 33137
T. 305.405.1700 \ F. 305.405.1701 \\ www.demerx.us



Chrysalis Pharma Partners, LLC
Attn: Bruce C. Galton
385 Rt. 24, Suite 1G
Chester, NJ 07930

May 10, 2012

Via Federal Express

Dear Bruce,

We are in receipt of your invoice of May 1, 2012 for the $75,000.00 incentive compensation fee and have now been able to review the reports and other materials that were received by DemeRx on or before April 30, 2012 as contemplated under our contract, as amended.

Based upon that review, made in light of the standard described in the contract, we find that the materials submitted to DemeRx on or before April 30, 2012 are unacceptable. As a result, Chrysalis is not entitled to the incentive compensation fee which is the subject of your invoice.

The reasons for this decision include the following:

1. Seven of the reports, including all of the GLP reports, received by DemeRx are unsigned draft reports.

2. As of the deadline date, DemeRx had not received even a draft of a final report of the 2-week dog study, the study that is necessary in determining the critical NOAEL level.

3. The draft report of the dog convulsion study is not written clearly enough to be easily understood by regulators or by DemeRx.

4. The Summary Report prepared by Chrysalis is inconsistent with the current draft of the dog convulsion study report.

5. The unsigned draft GLP study reports that have been received contain qualifications in the GLP statements.

6. Overall, given that we do not know the specific reasons why some of the reports have not been signed, it is impossible for us to rely on some of the information included in Chrysalis' Summary.

7. From a QA Systems standpoint, we need, and have requested, the site reports for each of the CROs' that include the ability of the CRO's to conduct the studies according to the applicable standards, including GLP regulations, if applicable. We do have in our possession the Xenometrics' site report.





4400 Biscayne Blvd., Suite 580, Miami, FL 33137
T. 305.405.1700 \ F. 305.405.1701 \\ www.demerx.us

In summary, for the reasons stated above, the Tox/DM/PK IND package delivered to DemeRx on or before April 30, 2012 does not meet the acceptance criteria for global regulatory documents in support of the initiation of human clinical trials.

We are continually reviewing documents as they are received with the objective of determining when they are adequate to support our planned submission. We are, therefore, looking to you to provide the final reports which will put us in a position to submit the necessary applications and accompanying or underlying reports to the applicable regulatory authorities. As you are aware, we need these reports as soon as possible since they represent a potential hold on the development timeframe for the commercialization efforts which would result in additional, unanticipated, costs for such efforts.

Generally speaking, we look forward to working with you in finishing the work required under our contract in order to meet the filing requirements. We appreciate the efforts you have provided to date and once the deliverables are complete we intend to revisit with you a bonus payment for a successful application.

Sincerely,

Holger Weis
COO/CFO DemeRx, Inc.
hweis@demerx.us


CC: David A. Stern, Esq.
60 Washington Street
Morristown, NJ 07960

**FedEx**  Shipment Receipt
Address Information

**Ship to:**
Bruce C. Galton
Chrysalis Pharma Partners.
LLC
385 STATE ROUTE 24
STE 1G

CHESTER, NJ
079302908
US
908-955-7052

**Ship from:**
Holger Weis
DemeRx, Inc.

4400 Biscayne Blvd.

Suite 580
Miami, FL
33137
US
3054051703

**Shipping Information**
Tracking number: 793554030378
Ship date: 05/10/2012
Estimated shipping charges:

**Package Information**
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50LBS
Declared value: 5.00USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

**Billing Information**
Bill transportation to: DemeRx - Destin-923
Your reference: DemeRx, Inc.
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

**Please Note**
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits. Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate sheets for details on how shipping charges are calculated.

**Amy Lee**

From:
Sent:                         trackingupdates@fedex.com
To:                           Friday, May 11, 2012 2:08 PM
Subject:                      Amy Lee
                              FedEx Shipment 793554030378 Delivered

---

This tracking update has been requested by:

Company Name:
Name:                         DemeRx, Inc.
E-mail:                       Holger Weis
                              alee@demerx.us

---

Our records indicate that the following shipment has been delivered:

Reference:
Ship (P/U) date:              DemeRx, Inc.
Delivery date:                May 10, 2012
Sign for by:                  May 11, 2012 2:04 PM
Delivery location:            C.MACDONALD
Delivered to:                 CHESTER, NJ
Service type:                 Receptionist/Front Desk
Packaging type:               FedEx Standard Overnight
Number of pieces:             FedEx Envelope
Weight:                       1
Special handling/Services:    0.50 lb.
Tracking number:              Deliver Weekday
                              793554030378

Shipper Information           Recipient Information
Holger Weis                   Bruce C. Galton
DemeRx, Inc.                  Chrysalis Pharma Partners. LLC
4400 Biscayne Blvd.           385 STATE ROUTE 24 STE 1G
Suite 580                     CHESTER
Miami                         NJ
FL                            US
US                            07930
33137

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 1:08 PM CDT on
05/11/2012.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

1

**FedEx**

Shipment Receipt
Address Information

Ship to:
David A. Stern, Esq.

60 WASHINGTON ST

MORRISTOWN, NJ
07960-6859
US
3054051705

Ship from:
Holger Weis
DemeRx, Inc.
4400 Biscayne Blvd.
Suite 580
Miami, FL
33137
US
3054051703

Shipping Information
Tracking number: 798384544697
Ship date: 05/10/2012
Estimated shipping charges:

Package Information
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50LBS
Declared value: 5.00USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

Billing Information
Bill transportation to: DemeRx - Destin-923
Your reference:
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with FedEx ShipManager at fedex.com.

Please Note
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheet for details on how shipping charges are calculated.

**Amy Lee**

**From:** trackingupdates@fedex.com
**Sent:** Friday, May 11, 2012 2:50 PM
**To:** Amy Lee
**Subject:** FedEx Shipment 798384544697 Delivered

This tracking update has been requested by:

Company Name: DemeRx, Inc.
Name: Holger Weis
E-mail: alec@demerx.us

Our records indicate that the following shipment has been delivered:

Ship (P/U) date:                    May 10, 2012
Delivery date:                      May 11, 2012 2:44 PM
Sign for by:                        N.MONUSKY
Delivery location:                  MORRISTOWN, NJ
Delivered to:                       Receptionist/Front Desk
Service type:                       FedEx Standard Overnight
Packaging type:                     FedEx Envelope
Number of pieces:                   1
Weight:                             0.50 lb.
Special handling/Services:          Deliver Weekday
Tracking number:                    798384544697

Shipper Information                 Recipient Information
Holger Weis                         David A. Stern, Esq.
DemeRx, Inc.                        60 WASHINGTON ST
4400 Biscayne Blvd.                 MORRISTOWN
Suite 580                           NJ
Miami                               US
FL                                  07960
US
33137

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 1:49 PM CDT on
05/11/2012.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number

1